**EXHIBIT A**

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Griffin Diecker, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On August 25, 2025, at approximately 9:37 a.m., I was positioned in the median on Interstate 70 near the 29-mile marker observing westbound traffic. During this time, I observed a white in color minivan pass my patrol vehicle in the right lane (slow lane). As the vehicle passed, I was unable to observe the vehicle's registration, in particular the state where the vehicle was registered.

2. I exited the median and began driving westbound to catch up to the minivan and conduct further investigation. Once I got close enough to the vehicle I could observe the top portion of the state name, believed to be Maryland, to be covered by the plate frame. I began conducting checks of the registration through law enforcement databases in an attempt to ascertain the vehicle's registration prior to conducting a traffic stop.

3. While running the license plate, with the suspected plate being registered out of Maryland, I learned the vehicle was registered to L.H. of Towson, Maryland and Q.H. of Cockeysville, Maryland. While I was behind the white minivan, I observed a passenger begin moving in the front passenger seat.

4.      After observing the above ILCS violation (obstructed license plate), I activated my emergency lights and conducted a traffic stop on Interstate 70 Westbound near the 19-mile marker. I exited my patrol vehicle and made contact with the driver, identified as Matthew HUGHES, and the front seat passenger, identified as Michael BOLEY.

5.      I advised HUGHES the reason for the traffic stop was due to the license plate frame partially covering the name of the state on the rear registration plate. HUGHES stated it was a rental vehicle. I asked if it was a TORO rental vehicle due to the vehicle's registration not returning to any of the more common rental vehicle companies. I observed BOLEY to have his phone in his hand with the rental agreement on the phone.

6.      HUGHES provided me with his Maryland driver's license. I also asked BOLEY for permission to look at the rental agreement and BOLEY handed his phone to me. I asked how long they had rented the vehicle for, and they stated it was a week-long rental. I briefly looked at the rental agreement before handing the phone back to BOLEY.

7.      While speaking with HUGHES and BOLEY I could smell the odor of unburnt cannabis emitting from within the vehicle. Additionally, while I was at the passenger side window BOLEY seemed uncomfortable with my presence. BOLEY would not make eye contact while speaking with me when I asked him about the rental agreement. Based on my training and knowledge, I am aware that drug traffickers utilize third party vehicles in an attempt to not have the vehicle seized if caught by law enforcement transporting illegal drugs.

8.      I requested that HUGHES come back to my patrol vehicle so I could provide him with a warning for the traffic violation. HUGHES exited the vehicle and walked to the front of the patrol vehicle.

9.      I advised HUGHES he could have a seat in the front passenger seat of the patrol

vehicle and HUGHES sat in the front seat. After HUGHES entered the vehicle, he stated he saw the rear registration plate frame was obstructing the license plate.

10. I asked HUGHES where they were headed to, and HUGHES stated they were staying at the Caesars in St. Louis that night. HUGHES stated they were spending the night in St. Louis and heading to Oklahoma City after that to visit his aunt and cousin. HUGHES stated they were going to spend a couple of days in Oklahoma. HUGHES stated they planned on leaving Oklahoma on Saturday and would like to be back home before Monday.

11. HUGHES stated they were not sure where they were going to stay in Oklahoma yet and they were either going to stay with his aunt and cousin or find an Air BNB. HUGHES stated the drive from Maryland to Oklahoma City is over 20 hours. HUGHES stated the next time he is going to fly out to Oklahoma. Based on my training and experience, I know that it is uncommon for people to not know where they are going to stay prior to arriving at their intended destination and that this is a common response for people involved with trafficking drugs and drug proceeds across the United States. I also know, based on my training and experience, that Oklahoma has become a source area for illegal marihuana.

12. HUGHES stated that BOLEY was his friend. HUGHES stated BOLEY rented the vehicle, and he was an approved driver on BOLEY's TORO account. I exited the patrol vehicle and walked to the front passenger side window to speak with BOLEY.

13. After speaking with HUGHES, I approached BOLEY and asked him to show me that HUGHES was an approved driver on his TORO account. BOLEY stated he would show me. I asked BOLEY where they were headed to, and he stated St. Louis. BOLEY stated they were on a "boy's trip" because HUGHES is getting married.

14. I observed BOLEY going through his TORO app on his cell phone and did not

observe HUGHES to be an approved driver on the rental agreement. BOLEY stated he could add him on the app to be an approved driver. I advised BOLEY it would be a good idea to add HUGHES as an approved driver.

15. I asked BOLEY if they were going to Oklahoma and he stated that was the plan; that Oklahoma was one of the places they were going. I asked how long they were going to be in Oklahoma, and BOLEY stated not long, and added they might be going to Texas too. I noted that BOLEY stating they were not going to be in Oklahoma for long contradicted HUGHES' statement that they were planning on leaving Oklahoma on Saturday, August 30th. Also, BOLEY contradicted HUGHES' story about their travel by stating they were also going to Texas.

16. I advised BOLEY I could smell marihuana inside of the vehicle and asked him if there was any inside of the vehicle and BOLEY stated there was no "weed" in the vehicle. I asked if they had smoked marihuana in the vehicle earlier and BOLEY stated "no." I asked for BOLEY's permission to search the vehicle, and he stated "no." At approximately 09:49 a.m. I requested that TFO Hayden Rapien (TFO Rapien) respond to my location.

17. I returned to the front seat of the patrol vehicle and HUGHES asked me if I told BOLEY about visiting his aunt and cousin. I informed HUGHES that I did not. HUGHES stated it was going to be a surprise for BOLEY.

18. I asked HUGHES if they had smoked marihuana inside of the car earlier and HUGHES stated they did not. HUGHES stated he did have personal use marihuana inside of the vehicle.

19. At approximately 09:51 a.m. TFO Rapien arrived on scene to assist with the investigation.

20. I advised HUGHES that he could exit the patrol vehicle. I walked to BOLEY and requested that he exit the minivan. BOLEY exited the minivan and stated, "you say you smell marihuana in the car." I advised BOLEY that HUGHES told me there was marihuana inside of the vehicle.

21. I asked TFO Rapien to conduct an open-air sniff with his K9 partner Draco. I observed K9 Draco alert to the odor of narcotics on the passenger side of the vehicle.

22. I advised HUGHES and BOLEY of the K9 alert to the vehicle and HUGHES stated there were two glass jars in his black suitcase that contained marihuana in the backseat. I also observed BOLEY begin rubbing his head with both of his hands.

23. I asked if there were any large amounts of United States Currency over $10,000 inside of the vehicle. I observed HUGHES and BOLEY look at each other before BOLEY stated "there's some cash in the center console." I asked how much there was and BOLEY stated "like $10,000."

24. TFO Rapien and I walked to the white minivan where I opened the center console and observed three bundles of rubber-banded United States Currency. I observed the rubber-banded currency to contain several denominations. I removed the three bundles from the center console and gave them to BOLEY for safekeeping. I asked BOLEY if that was his money, and he said it was.

25. TFO Rapien and I continued searching the vehicle. I located two glass jars containing 27.6 gross grams of suspected marihuana inside of a black in color suitcase, which was previously claimed by HUGHES.

26. While continuing to search the vehicle, TFO Rapien located two plastic baggies containing pills inside of a cross-body bag that was on the driver's side seat. Additionally, inside

the cross-body bag, TFO Rapien located a clear plastic baggie containing 12 unknown white pills (2.7 Gross Grams).

27. TFO Rapien located a black plastic baggie containing 11 yellow pills (4.2 gross grams) of suspected Xanax inside of the cross-body bag.

28. I opened a blue in color bag which contained a green Rolex Box. Inside the blue bag, I also located a large amount of rubber-banded United States Currency. The packaging of the currency was consistent with that of drug proceeds, as it was various denominations of bills, rubber-banded, and the occupants of the vehicle were not forthcoming about the currency being in the vehicle.

29. After locating the suspected drugs and drug proceeds, TFO Rapien and I returned to HUGHES and BOLEY and placed them in handcuffs. I placed BOLEY in handcuffs in front of his body and TFO Rapien placed HUGHES in handcuffs behind his body.

30. TFO Rapien removed the money previously given to BOLEY for safekeeping and gave it to me. I placed the money in the front passenger seat of the minivan until it was safe to place into an evidence bag.

31. TFO Rapien removed a "Cuban" style necklace and wallet from BOLEY's pockets and placed them in the front passenger seat. I removed HUGHES' handcuffs and placed them in front of his body. TFO Rapien escorted BOLEY to the rear of his patrol vehicle and secured him inside. I asked HUGHES if he had a phone on his person and he stated it was in the minivan. HUGHES was escorted and placed into the front seat of my patrol vehicle.

32. At approximately 9:57 a.m., I read HUGHES his Rights per Miranda. HUGHES stated he understood his Rights per Miranda by stating "yeah." I asked HUGHES if he was currently under the influence of any kind of alcohol, medications, or narcotics and he stated

"no." I asked HUGHES if he knew about the money that was located inside of the vehicle. HUGHES stated, "honestly no, I'm just a driver myself." I asked HUGHES if this was his friend's money (BOLEY's) or someone else's, to which HUGHES replied stating "you would have to talk to him (BOLEY)."

33. I asked HUGHES if they were actually going to Oklahoma, and he stated "yes." I asked HUGHES if they were traveling to Oklahoma to purchase marihuana. HUGHES stated, "I have no idea about the money or any of that at all." I asked HUGHES if they had any intentions on going to Texas. HUGHES stated "no."

34. I asked HUGHES if BOLEY knew HUGHES' family in Oklahoma. HUGHES stated that BOLEY knows all of HUGHES' family, his Uncle Terry and Aunt Pam.

35. At approximately 9:59 a.m., TFO Rapien and I walked to the rear of TFO Rapien's patrol vehicle where BOLEY was secured. I read BOLEY his rights per Miranda. After reading his rights per Miranda I asked BOLEY if he understood, and he nodded his head up and down indicating yes. I asked BOLEY if he was under the influence of any kind of alcohol, medication, or drugs and he nodded his head side to side indicating no. I asked BOLEY if the money inside of the vehicle was his. BOLEY nodded his head up and down once. BOLEY then stated he wished to speak with an attorney. After requesting an attorney, the interview was concluded.

36. I opened the green Rolex Box and located a gold in color Rolex watch inside. I also located a Glock 17 9mm handgun inside of a green bag on the rear driver side seat. The handgun did not have a bullet in the chamber but contained 5 full metal jacket bullets inside of the magazine that was inserted in the firearm.

37. At approximately 10:02 a.m., TFO Doug Danielson (TFO Danielson) obtained a

Self-Sealing Evidence Envelope (SSEE), and I began placing the United States Currency that was previously located within the blue bag, along with the money originally located in the center console, inside of the SSEE.

38. While removing the United States Currency from the blue bag, I located two glass vials containing suspected steroids inside the side pocket.

39. I placed the previously located gold in color Rolex Oyster Pearl Day-Date watch and the "Cuban" style necklace inside of a SSEE bag.

40. While checking BOLEY's wallet I located a hand written marihuana drug ledger. The ledger listed different strains of marihuana in one column and the corresponding cost of each particular strain in a second column.

41. I returned to my patrol vehicle and placed the SSEE bags containing the United States Currency and the jewelry onto the hood of the patrol vehicle. I placed the SSEE bags containing Drug Exhibits into the trunk of my patrol vehicle and secured them inside.

42. At this time, I observed HUGHES knocking on the passenger side window. While speaking with HUGHES, I asked HUGHES whom the jewelry belonged to, and he stated it belonged to BOLEY. HUGHES stated he was aware that the jewelry was inside of the vehicle.

43. I asked HUGHES where they originally picked up the rental vehicle and he stated Maryland. I asked if they picked up the vehicle together and HUGHES stated BOLEY picked the vehicle up and picked him up afterwards. HUGHES stated they left Maryland last night around 11 p.m. HUGHES stated they drove throughout the night. HUGHES stated he has been driving the whole time.

44. I asked whose idea was it to go to Oklahoma. HUGHES stated "what?" I asked HUGHES again who's idea was it to go to Oklahoma. HUGHES stated "me." HUGHES stated,

"to visit my family."

45.     I asked how much time they will be spending in Oklahoma and Hughes stated they have the rental all week and they will be staying out there the whole week. I asked if BOLEY had anything to do with the planning for going to Oklahoma. HUGHES stated they planned the trip together. I asked HUGHES what the purpose of the trip was. HUGHES stated "to visit family and stuff like that for me. My biggest reason was a boys' trip, to get away for a little bit before I get married." I concluded the conversation with HUGHES and closed the door.

46.     TFO Danielson and I placed the SSEE bags containing the United Stated Currency and the jewelry onto the hood of TFO Rapien's patrol vehicle. At approximately 10:14 a.m. I removed BOLEY from the rear of the patrol vehicle and escorted him to the front of the vehicle. TFOs asked BOLEY if he would like to sign as the owner/possessor of the United States Currency. BOLEY began thinking about it for an extended period of time, nodding his head no, and then stated that he didn't know what that meant. TFOs explained to BOLEY that signing the SSEE meant that he is the owner/possessor of the currency. BOLEY went back and forth numerous times, stating he would sign and having the pen in his hand, to not wanting to sign. At approximately 10:27 a.m., BOLEY was returned to the rear of TFO Rapien's patrol vehicle.

47.     At approximately 10:23 a.m., Special Agent Jeffrey Ussery (SA Ussery) and TFO Leo Kelly (TFO Kelly) arrived on scene to assist with the investigation.

48.     After asking BOLEY if he wished to sign as owner/possessor, TFO Danielson and I took the SSEE containing the United States Currency to the front of my patrol vehicle. HUGHES was removed from the vehicle and walked to the front of the patrol vehicle. I asked HUGHES if he would like to sign as the owner/possessor of the United States Currency. HUGHES did not wish to sign as the owner/possessor. HUGHES was also asked if he would like

to sign the SSEE containing the jewelry and HUGHES stated that the jewelry belonged to BOLEY. HUGHES then returned to the front passenger seat.

49. BOLEY was brought to the front of my patrol vehicle and asked if he would like to sign as the owner/possessor of the jewelry. BOLEY signed as the owner/possessor of the jewelry as witnessed by TFO Danielson and me. BOLEY refused to sign as the owner/possessor of the United States Currency.

50. I sealed both SSEE bags in front of BOLEY and HUGHES, as witnessed by TFO Danielson. TFO Danielson escorted BOLEY to his patrol vehicle and secured him inside the front passenger seat. I placed the sealed SSEE bags into the rear passenger seat of my patrol vehicle.

51. At approximately 10:34 a.m. TFO Kelly began transporting the white Toyota Sienna minivan to the Fairview Heights Resident Office (FHRO). I transported HUGHES to the FHRO and TFO Danielson transported BOLEY.

52. At approximately 10:59 a.m. TFOs and Agents arrived at the FHRO. TFO Ward escorted HUGHES inside and placed him inside the interview room. TFO Danielson escorted BOLEY inside the FHRO into a holding cell.

53. At approximately 11:00 a.m., SA Ussery and I entered the interview room with HUGHES. SA Ussery asked HUGHES how he knows BOLEY. HUGHES stated that they have been friends since high school. HUGHES stated that BOLEY moved to Colorado for 5 or 6 years and they lost touch. HUGHES stated that they reconnected a few years ago while he was in a half-way house. HUGHES stated that he is sober now but had been an IV heroin user and had been in 13 rehabs. HUGHES stated that he and BOLEY both used to get high and that BOLEY is also off the hard drugs.

54.     SA Ussery asked HUGHES about their travel plans. HUGHES stated that they were going to stay at the Horseshoe Casino in St. Louis tonight and then tomorrow they were going to drive to Oklahoma City, Oklahoma. SA Ussery asked HUGHES whose family they were visiting and HUGHES stated, "I call them family." HUGHES further stated he calls them "Uncle Terry" and "Uncle Pam." HUGHES further stated that he met Terry and Pam at a music festival and was going to surprise BOLEY and introduce them all. I noted that this statement contradicted HUGHES' earlier statement that BOLEY knows HUGHES' family, specifically Uncle Terry and Aunt Pam.

55.     HUGHES changed his story and stated that it was BOLEY's idea to go on the trip. HUGHES stated that BOLEY rented the vehicle, picked up the vehicle, and then picked up HUGHES. HUGHES stated that the only item in the vehicle that belonged to him was the black bag that contained the marihuana. HUGHES stated that he didn't think BOLEY was currently employed and knew that BOLEY had previously been a part-time server.

56.     During the interview, SA Ussery asked HUGHES if he would consent to a search of his cell phone and HUGHES signed a consent form.

57.     At approximately 11:30 a.m., TFO Travis Houget (TFO Houget) responded to the FHRO, where he utilized his K9 partner Bama to conduct an open-air sniff of the seized United States Currency. Upon completion of the K9 sniff TFO Hoguet advised K9 Bama indicated the odor of drugs was emanating from the United States Currency.

58.     While reviewing HUGHES cell phone information, TFO Kelly observed several hundred photographs depicting bulk marihuana in vacuum sealed bags and other plastic bags. The photos appeared to have been taken by HUGHES to display marihuana strains he is offering for sale. TFO Kelly also observed several images that appeared to depict marihuana plants. TFO

Kelly observed photographs showing bulk currency that would not be consistent with HUGHES' employment as a bartender. TFO Kelly also observed a large number of videos that appear to have been taken by HUGHES that show bags of various marihuana strains.

59. While reviewing the messages on HUGHES' device, TFO Kelly observed various messages that appear to be arranging for the purchase and/or sale of illegal drugs. HUGHES utilizes multiple messaging and social media platforms to communicate with customers.

60. On August 22, 2025, at approximately 9:28 AM, HUGHES received the message, "Do you have weed?" from the phone number saved as "Das Kitchen Zip Bro." HUGHES responds, "Yes". Das Kitchen Zip Bro then messaged, "Can you send me a photo of what's new bro?". Utilizing the social media application Snapchat with account name whistlin_wizz, HUGHES sent an image of marihuana to the Snapchat account gerargo247537. HUGHES then text messaged, "Check snap." HUGHES and the customer then go on to discuss price, and location to conduct the transaction.

61. On August 20, 2025, at approximately 10:04 PM, HUGHES messaged a phone number saved as "Brandon Tilbot Das." The message stated, "Yo." He responded, "What's up bro." HUGHES messaged, "Few diff trees lmk ill hook it up." TFO Kelly is aware that trees is common slang for marihuana. On August 21, 2025, at approximately 1:37 AM, the customer responded, "Word ill be looking for some tomorrow probably a half." Based upon these messages, it is believed that HUGHES was going to sell this individual either a half ounce, or half pound of marihuana.

62. On August 23, 2025, at approximately 1:23 PM, HUGHES messaged a phone number with no saved contact information, "Yo", "This eddies friend." The individual responded, "Whats good man, yea im looking for molly or girl." TFO Kelly is aware that molly

12

is common slang for MDMA, and girl is common slang for cocaine. HUGHES responded, "I got mollz." The individual responded, "Right on, I'd grab a g off ya if possible." The two go on to discuss meeting, and HUGHES tells the individual to add him on Snapchat.

63. TFO Kelly observed numerous other messages on HUGHES phone that appeared to be arranging drug purchases and sales.

64. Agents also asked BOLEY if he would consent to a search of his cell phone. BOLEY declined and agents obtained a search warrant.

65. While reviewing BOLEY's phone records, TFO Degener located a picture HUGHES sent to BOLEY on July 9, 2024, of his bank account that showed his available funds at $422.25, appearing to prove to BOLEY that HUGHES did not have money. On September 17, 2024, BOLEY texted HUGHES, "U wanna ride with me for the day. I gotta go get some za in nyc and he might have carts." Investigators believe BOLEY was going to New York City to pick up bulk marihuana when he is talking about "za" and marihuana cartridges when he says "carts."

66. While reviewing HUGHES cell phone information, TFO Degener observed a conversation that took place on October 3, 2024. During that conversation, phone number xxx-xxx-1610, hereinafter "1610", sent a video of bulk bud marihuana in bag to BOLEY. On October 23, 2024, 1610 sent BOLEY two videos of bulk bud marihuana in bags.

67. TFO Degener also observed that on December 23, 2024, BOLEY sent a photograph of himself and an unknown white male. In the photograph BOLEY was holding a shoe box full of rubber-banded bundles of United States currency.

68. TFO Degener also observed a conversation on April 1, 2025, wherein BOLEY sent a message to 1610 stating, "I owe you 1375." "I ain't have it all in my bank." 1610 responded, "You ain't have it cash." BOLEY responded, "No I forgot to stop remember I'm bout

go in town grab more tho." BOLEY implied later in the conversation that he would be two to three hundred dollars short. Investigators believe BOLEY owed 1610 for marihuana products, but did not have all the money.

69. TFO Degener observed another conversation on July 9, 2025, wherein BOLEY tells 1610 that he owes BOLEY money and BOLEY needs it now before he leaves today. 1610 and BOLEY argued back and forth about BOLEY asking for money last minute. On the same date, 1610 texted BOLEY, "Bro I called you said sum about niggas fucking ya money up let me hit Marty for you." BOLEY replied, "Yeah that's why I needed that bread."

70. TFO Degener observed a conversation on August 18, 2025, wherein BOLEY sends 1610 a picture of what appear to be a ledger totaling $139,950. This amount is very similar to the seized amount on August 25, 2025, of $138,673. On the same date, 1610 sends a photograph of a ledger totaling $4,250.

71. While reviewing BOLEY's cell phone information, TFO Degener observed multiple pictures of bulk marihuana in bags. TFO Degener observed a photograph of a ledger that BOLEY took on August 2, 2025. The background of the picture includes vacuumed-sealed marihuana. TFO Degener observed another photo of loosely packaged bulk marihuana in a bag taken July 20, 2025. TFO Degener observed multiple photos of loose marihuana taken on July 24, 2025.

72. TFO Degener observed a screenshot of BOLEY's "Notes app" taken on June 19, 2025. In the screenshot, there are six notes tabs that are visible: one from April says, "5 cotton candy @1k and 5r36 @900" and another that says "P order" with "5Gb 100 @975." Investigators believe that these notes represent the prices of specific strands of drugs, most likely marihuana, and the price per pound.

73. TFO Degener observed another screenshot from June 17, 2025, with what appears to be different strands of marihuana and how much they cost per pound.

74. An official count of the seized United States currency was conducted. The amount totaled $138,673.00.

75. On October 21, 2025, BOLEY submitted an administrative claim to DEA wherein he stated, under penalty of perjury, that he is the lawful owner of both the $138,673.00 in United States currency and the jewelry. BOLEY did not submit any supporting documentation or provide any further explanation.

76. During this investigation, I learned that on December 26, 2025, HUGHES was arrested in Harford County, Maryland and charged with two counts of Assault – Second Degree.

77. On December 26, 2025, a Deputy with the Harford County Sheriff's Department responded to HUGHES' father's house for a domestic incident. After interviewing the people in the home, the Deputy learned that HUGHES' father gifted money to HUGHES and his girlfriend for Christmas; however, he wanted HUGHES' girlfriend to possess all the money due to HUGHES having a drug problem. HUGHES' father was afraid that HUGHES would use all the money to buy drugs. HUGHES eventually got half of the money from his girlfriend and asked his father to drive him home. (HUGHES sustained injuries to both of his legs in August of 2025 that requires him to rely on a wheelchair for movement.)

78. When HUGHES' father refused to drive HUGHES home, HUGHES commented that he would have someone come pick him up and take him to the city to buy drugs which would cause him to die. After this comment, HUGHES' father refused to let HUGHES leave. HUGHES then began running into his father with his wheelchair, pushing his father up against the door, and striking him twice in the genitals. HUGHES also struck his father in the face with a

closed fist.

79.     During the interview with HUGHES' girlfriend, she reported a past physical domestic incident that occurred on December 20, 2025. She told the Deputy that she arrived home from work on December 20th and found HUGHES passed out in the living room with a bag of Xanax on his person. She stated that she flushed the Xanax down the toilet. A few hours later, HUGHES woke up and began arguing with his girlfriend over the narcotics. HUGHES struck his girlfriend with a broom and a Stanley water bottle. HUGHES also struck his girlfriend with his hand leaving a black eye.

80.     HUGHES Arrest Sheet from the Harford County Sheriff's Office describes HUGHES as "drug user-seller, assaults police, violent tendencies (resists arrest)."

81.     Based on the foregoing, declarant believes that the $138,673.00 in United States Currency and the jewelry is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. Section 801 *et seq*.

Pursuant to 28 U.S.C. Section 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  22  day of January, 2026.

*Griffin Diecker*
GRIFFIN DIECKER
Task Force Officer
Drug Enforcement Administration